State number 20-1343 et al. Constellation Mystic Power LLC petitioner v. Federal Energy Regulatory Commission Good morning, Counsel. Mr. Fitzgerald, please proceed when you're ready. Thank you, Your Honor. May it please the Court, Matt Fitzgerald on behalf of Constellation Mystic. This FERC appeal is about two LNG fire generators in Boston Harbor. And in a cold winter, these generators could save New England from rolling blackouts. So Mystic entered into an agreement with ISO New England that the rate payers, under cost of service principles, would compensate Mystic for two winters. FERC reviewed and quite properly approved most of this agreement. But in three finite areas, FERC arbitrarily and capriciously cut down Mystic's recovery. And those areas are rate base, capital structure, and one element of the fuel supply cost. Now, on rate base, the right answer is very clear. Ten years ago, on the open market, Mystic paid $925 million for these units, eight and nine. That number was computed by an independent auditor using generally accepted accounting principles at a time when there was no incentive whatsoever to inflate it, and years before this particular dispute ever arose. So quite literally, Mystic is asking for its, quote, cost of service. One component of that being the cost that it actually paid to provide the generators that are going to provide the public service. Now, instead, FERC took an arbitrary turn on this. It looked back 15 years to a transaction in which these generators were transferred in lieu of foreclosure in exchange for forgiveness of about $550 million worth of debt. And it pulled that transaction forward, essentially saying, this is the cap from which all further depreciation, all further transactions must be below. And there was no good reason for doing that. Now, can I just ask a question? When you say that was arbitrary, I understand your argument to be not that it was arbitrary in the sense that it wasn't in keeping with what the Commission has done before, because it is in keeping with what the Commission has done before in terms of the approach that's used. Your argument is that it's arbitrary to apply that approach to this situation because of the particularities of the circumstances attending Mystic's conversion from merchant to cost of service. That is one of the arguments, yes, Your Honor. But it is important to note that doing the test in exactly this way is unprecedented in some sense. And that is, there is no example, FERC has given no example of looking back to an early merchant-to-merchant transaction like this and using that going forward in this way. So, in addition to what you said, we contend that it is unprecedented to do it this way, not that this is sort of how it's always been done. Now, in the original cost test, when the utilities are- What about the fact that one of the things that FERC argues is that it needs to have a consistent test? So, even though facilities may go back and forth between cost of service and merchant, you know, it's best to have a consistent test. Well, Your Honor, a consistent test can be a reasonable thing, but a consistent test when the facts don't support that at all is arbitrary. I mean, it would be consistent to, say, flip a coin in every case too, but it still can be arbitrary even if it is uniform. And so, what's so different here is, what they're trying to do is apply cost of service as if these units had been cost of service their entire lives. But this transaction, in particular the $550 million transfer in lieu of foreclosure, just wouldn't make any sense if those units had been cost of service at that time. But it's cost of service now, and I think FERC's view as well, if it's cost of service now, we treat it this way. Oh, that's certainly their view, Your Honor, but... So, why is that unreasonable? It's unreasonable because it's losing all touch with the purposes of the test that they're attempting to apply. So, the original cost test exists because cost of service utilities would have incentive to inflate their prices intentionally, to pay more than anything's worth in order to get that money plus a return on it back out of rate payers. But no one's even said that that could possibly be... It's not that the price is not inflated here, it's that there's not even any incentive to inflate that price here. It's the price that we actually pay, which has been confirmed by generally accepted accounting principles and an independent auditor. And so, by saying, well, really it should be hundreds of millions of dollars lower because of this transaction many years ago where you want the buyer, it just doesn't really make sense in a way that the original cost test would if it had been cost of service its whole life. So, I mean, I assume I agree with you that this does create a kind of unfairness to MISTIC. I understand. I take your argument about that. But it seems to me that what the commission... I mean, the commission's view as well, you know, may create unfairness in some situations, but it's still better that we have a settled rule, right? Well, Your Honor, this is a very... So, first of all, this is a very unique situation that we are in. This is the first time ever that we're aware of that there has been a generator like us retained for fuel security. We're uniquely positioned in many ways in Boston Harbor relying on shiploads of LNG. And so, for us to say this is different than the original cost test applied to the lifelong 40-year cost of service life, it is vastly different. And it's a tremendous cut down and without any real justification for it on these facts. That is what we paid. There was no incentive to inflate that. And it's worth keeping in mind. I mean, FERC may say, we want to check, you know, we want to test. We want to test the price that you paid. We're groping for a test here. But keep in mind, if they were to compare our purchase price to the original depreciation line, our purchase price is lower. So, in other words, the facility is built for just under a billion dollars. If you ran that depreciation over 40 years and included the capital additions and expenditures, you know, improvements along the way, that line would be higher than the $925 million that we paid. And so, there really isn't any way to slice this that the rate payers would be overpaying in some sense by setting the rate base at the price that we paid. There would be situations, unlike this one, in which applying the original cost test, would still arguably lead to some disparity between the explanation for the test, this incentive point that you've made, and the actual facts on the ground. Right. It's not only this circumstance that gives rise to that possibility that there's an application of the test and circumstances in which the incentive justification isn't exactly borne out. So, what's the rule? What's your rule for this? In other words, I don't take you to be arguing that the original cost test is itself arbitrary and should never be applied. Right. So, what's your rule for when it's arbitrary to apply it? So, I think, and our facts are even better than this rule, but the key fact, I think, is that we were a merchant buyer buying a merchant facility for use as a merchant. And under those circumstances, what we paid, what the market value of it was, just had nothing to do with what we could ever get back, what we could ever get from rate payers later. And so, under those circumstances, pulling forward all of the old past transactions is just particularly nonsensical. And so, you're saying if it's a purchase that was made at a time when the buyer is a merchant buyer and had no idea in his mind that there would be a shift to cost of service. That's a circumstance in which you can't apply the original cost methodology. Yes, and of course, our facts are a little better than that, but I think that's the core of it. And that does make sense because a merchant buyer buying a facility operating as a merchant isn't going to envision switching it to cost of service. I mean, the way in situations like that that cost of service eventually comes up is the merchant is basically going out of business. The enterprise is a failure, and then what happens is another entity, ISO New England, that we don't control, comes along and says, we need you for two more years. And so, it's hard to envision any merchant buyer saying, let's consider the possibility that this will totally fail, and then after that, the possibility that some entity we don't control will say, we need you for two more years, and how they would price that entity if they did that, you know, it's sort of impossible to envision a merchant buyer sort of thoroughly taking this into account. I mean, particularly before this case, because I don't think even if we had envisioned the cost of service, switching to cost of service many years later, that we would have known FERC was going to apply the test the way that it has here. So, that approaches it from your perspective as on the purchaser end. Then on the rate payer end of it, there's a prong of it that asks, that it seems to me is at issue here, and is at issue with the original cost methodology, which asks, what's it fair to pass on to the rate payers? And as I understand it, there is a doctrine under which the original cost test wouldn't apply if it can be shown that something beyond the depreciated cost actually is a benefit to the rate payers. And why doesn't that account for it? So, the cost test, you could be right that it doesn't always work in every situation, but there's already something built into the test that allows for situations in which something else should be used. Yes, Your Honor, and that exception doesn't fit here for the same reason that the test in general doesn't fit here. My understanding of that test is, if you can show that paying a premium over the value was itself like a direct benefit to rate payers, then perhaps you can recover from them the premium. But those terms don't even really make sense here. We didn't pay any premium over value. We paid what it was worth on the market at $925 million. So, to say that, to compare that to the far lower number and say, well, that's a premium that benefits the rate payers, I mean, this was done six years before that sort of issue was ever considered. And so that's why there's no argument for that particular measure. But wouldn't that also be the case in other situations, too, in which the original cost test is applied, that there could have been some transaction along the way, and by operation of the test, you only take into account the lowest cost one that was at some point in the past? Well, no, Your Honor, because so the vast majority of the time when this test is applied, it's to generation that has always been cost of service. And so all they're really doing in that situation is comparing the immediate purchase price to the immediate sort of existing value that the current cost of service utility is getting. And here what I'm saying is these old transactions, including the $925 one, were merchant to merchant, so the old merchant wasn't getting anything that was cost of service. But is it not the case that even if it's been done under cost of service for a long time, and this just may be my ignorance of the industry, but even if it's cost of service all the time, there still could have been transactions along the way. There still could have been purchase and sales. Yes, exactly. And those are all done with a close eye on what the cost of service valuation is. Now, sometimes they may be a little bit higher. A company might say, well, it's worth us to pay a little bit more. It's more efficient for us for some reason. And they may try to prove that that's to benefit the rate payers, which makes perfect sense when they're a cost of service utility. They are recovering from the rate payers. They may try to get that benefit back, or they may pay a little bit less and move that depreciation line down. But there is no example of something hundreds of millions of dollars off the way that this is. And the only way that that comes about is these merchants, this long history of merchant operation and the many transactions along that way that don't make any sense to go back and apply the original cost test, with neither party having any sort of incentive about the value that way. Now, the two other issues, the capital structure and the fuel cost from Everett. Capital structure is the issue that FERC has just issued an order about two days ago. But the key to that is it doesn't seem that FERC is changing the core thing that we are objecting to about that order. And that is the failure to use our immediate parent, XGEN's equity structure of 67%. So everybody agrees that in a situation like this, you generally would use the immediate, the closest parent's equity structure. Here, XGEN has its own credit rating, actually does the finances for Mystic, and so it would seem to make the most sense. Can I ask you on this? And we'll ask Commission Council about this too. At least I have some questions about what are we supposed to be doing with this issue now? Because if the equity, if the capital structure that was in place and that you're challenging is no longer the one that's going to be used, which is that, I think everybody agrees, the point, then is it not the case then that the Commission now needs to figure out what the right capital structure is, and at least there's at least some possibility it could end up being the very one that you think is the right one, which is XGEN? Yes, and the problem with all of that is it's not clear to us that they are backing off. In other words, FERC could easily say in the future, we've already decided we're not using XGEN. We're not going back to that. We can't use Exelon Corp anymore, so the question now is what to use. But it's not clear to me that they're going to give us another shot at arguing we should use the immediate parent. I mean, their order just isn't that clear on that. Suppose they tell us that they will. If they tell us that they will, then the idea that it's moot would be much stronger. Okay. But I think still there is this... So, in other words, your argument for urging us to reach out to do it is contingent on their saying, we already made a decision that it's not going to be XGEN. That continues. We're never going to look at XGEN. It's not entirely dependent on that. I think that if they really were going to reconsider it that way, then it would be a stronger argument for mootness. But I think the way that we fear they're setting it up is it's a two-step analysis. They're not going back to step one. So, in other words, if they decide never to go back and reconsider using XGEN itself, they could say we've already decided that and we're not going back. And if they say that, then in that case, the right time to appeal it would be now. But then for us, in order for us to reach it, it seems to me, and to resolve it, our rationale would have to be the only conceivable rate that would be non-arbitrary, the only conceivable structure that would be non-arbitrary would be the XGEN one. Anything else would be arbitrary, and therefore we can just cut everything off and agree with you, which is apparently what you want, which is the XGEN structure. Yes, Your Honor, but I think the path to that is an easier one than you might be envisioning because all agree that the general presumption is to use the immediate parent, and so FERC made this finding, the immediate parent is anomalous and we're not going to use it, and that's what we're saying is wrong. So if you agree with us on that, then yes, that's the impact as you envision it. We could also agree that, I mean, could we also agree that that's wrong, but then still re-manter FERC to determine an appropriate rate, including potentially the immediate parent's rate. And that would be very helpful, of course, on that. Mr. Grishkos, I had a question about, did FERC have jurisdiction to issue its May 2nd order in this case, given that the record is- Given that this Court should have jurisdiction of it? Under 25L. So I think the way to look at it, that FERC would have jurisdiction, would be to take this assumption that this is a follow-on, that they're not going back to what this Court is considering, that it's, of course, open to this Court and proper for this Court to consider that issue, and that on the assumption that they're not going back, they can go on and proceed, though it may be voided by what this Court did. If they're really reconsidering it, then there could very well be a problem with that. Yes, I think this Court should have jurisdiction of that issue, and I think there are ways that FERC can ask for it back. Is our jurisdiction exclusive now that the record has been sent to us and this case is before us? I think that it is. Did anybody object to FERC's issuing the order on that basis? I'm not aware of that, Your Honor, and I think that they were operating on the assumption that that is what needs to be figured out if this Court were to affirm and that FERC isn't reconsidering in that way that it would be more likely to run into the jurisdictional problem. I'd like to save some time, but just briefly, on the last issue. The last issue is the fuel supply charge from Everett. And what we're asking for is to recover from Everett, in the fuel supply charge, money that's credited to the purchase of Everett. That's no different than any other owner of Everett would charge in a fuel charge. So to borrow FERC's analogy, if we view Everett as a gas station, whoever owns the gas station is going to sell gas at a price that allows them to pay the mortgage on the gas station, and that's all that we're asking for here, just a two-year amortization of that. So I'd like to save the rest of my time. Thank you. Thank you, Mr. Fitzgerald. Mr. Coyle, we'll hear from the Commission now. Robert Kennedy on behalf of the Commission. Oh, I'm sorry. Kennedy, sorry, Mr. Kennedy. I got the order wrong. I apologize. I didn't hear you, so I wasn't listening. Okay. Now, in this case, the Commission, I'll start with rate base, unless the Court has any particular place they want me to start. But in this case, the Commission applied its longstanding original cost rule in calculating MISTIC's rate base. Now, MISTIC is correct. The rule sort of grew out of concerns arising from transactions between entities that were operating in a cost-based rate regime, but the remedy adopted objectively valuing facilities through the depreciated original cost applied in all circumstances where facilities come into a cost-based rate regime. And that's because it really reflects kind of the fundamental balance underlying cost-based rates. On the utility side of the equation, cost-based rate allows them to recover their cost plus a guaranteed return. But in order to provide some protection to the consumers, who in this case are now captive consumers, who don't have a seat at the table when these facilities are being bought and sold previously, the original cost rule applies an objective measure to value those facilities, and it's the original cost of construction plus capital expenditures minus depreciation. And certainly, if entities want to purchase these facilities at a price above the depreciated original cost because their view of the future value based on the cash flows they think they can generate from these facilities, they're welcome to do so, but the original cost test makes sure that captive rate payers aren't going to be the guarantor of their business, essentially. Now, MISTIC's fundamental contention is that they operated under a market-based regime previously, and therefore the test shouldn't be applied. But as the Commission found, now we're talking about what do we do now? Cost-based rates and captive rate payers, and the Commission found that we need a uniform rule. If you had a different accounting standard based on looking back on whether sales are made pursuant to or when you're operating in market-based rates or cost-based rates, you would have two different results. The same facility would have a different rate impact depending upon the tariff under which the operator sold power into the market. And the Commission found that that wasn't appropriate. Now, the argument seems to be that, you know, these prior transactions that below the depreciated original cost would never have happened in a cost-based rate regime. But as the Commission pointed out in these orders, there's numerous instances where the Commission has had to address how to handle negative acquisition adjustments, which is what they call the delta between the depreciated cost and the sale price when it's below. And I think the fallback that you see in the reply is, well, nothing this bad has ever happened. And certainly I can't point you to a case that involves these specific facts. But I will note in the NEPCO case, which is discussed in our brief for just general cost-of-service rate-making principles, the first issue addressed in that case, and that was issues in, I believe, the late 80s, so where everyone for the most part is operating under cost-based rates. The question was a project had been undertaken, ran into construction delays, the market turned, so they had to cancel it, even though they were operating under a cost-based rate regime. And the question was, how should the cost be allocated? So the fact that there is cost-based rate tariffs doesn't inflate these sales from swings in the market, but it could be transactions like we saw here. If you could just explain to me, I mean, I understand the preference for having a rule, you know, using the cost-based test kind of across the board, but in setting the base rate, why shouldn't the commission take into account maybe unusual circumstances like the ones we have here? You know, what's the reason to have kind of a very rigid rule in this context? Again, I think it goes back to kind of the point that we're going to guarantee your costs in return, but we need some protection for rate payers, so we're not going to get into, you know, the reasonableness of fair market valuations. And, I mean, you see that in this case. The record is hotly disputed among the parties, and the commission didn't have to make any resolution here about whether that $925 million, which was allocated to Mystic Gate 9, is really a reasonable price. So the original cost test just provides an objective measure just to take that all off the table. And, I mean, it's been around for years. I know the statements here today and in the briefs that, well, we never would have thought about this. But it has been on the books for a long time, and Mystic Gate 9 were under a cost of service regime for a certain portion of their lives. So, you know, we would certainly say there was fair notice that this is the way the rate base. So there might have been some notice, at least, from, and you could argue it's bolstered by the fact that there was a cost of service period there. But do you take issue with the notion that the incentive, the underlying incentive basis that's been proffered for the original cost test to the effect that it prevents a situation in which there's a transaction that comes along that's inflated in order to, precisely for the purpose of passing along the inflated amount to the rate payers and thereby garnering an edge for the purchaser, that that dynamic doesn't exist in the circumstances of this case? Yes, when it's between, when it's a merchant buying it, yes, without the cost base, the captive consumers to fall back on. Yes, that precise incentive is not there. But I think there is a similar point, though, that, again, the original cost test prevents rate payers from being caught holding the bag when someone places a market value on a facility that turned out not to be true. I mean, you know, in this case the bet was we can make $925 million plus back from these facilities and, you know, a couple of years later they're having to close them down and essentially the original cost test allocates that risk to the, you know, to the purchasers rather than the captive rate payers. Yes, let me just find out. I'm just keeping rough track. What's that? The timer isn't showing. Yes, the timer isn't showing. Sure, that sounds good. Did everybody catch that? One beef when you've entered into rebuttal time. Okay. Two beefs when the time has expired. Okay. Where are we now, Russell? Eight minutes and 53 seconds. Okay. I apologize. It's our mistake. So with respect to... I guess unless there's anything else I'll move on to capital structure. With respect to capital structure, I guess maybe I'll start with the where are we now. I take your point about jurisdiction. It certainly was not something that was raised, and I'm just thinking it through now. It's not so much... So as we view 825L, I think it is that, you know, the commission loses jurisdiction once it's filed a certified record, which it did, and I think the case law that exists indicates that that prevents the commission from reconsidering its position here. There's really a changed circumstance. The parties wanted to... The commission is not considering, based on the record that existed then, what the capital structure is. It's a changed circumstance and kind of an amendment to the agreement, so I'm not certain 825L would apply, but... I think 825L envisions that FERC will file something with this court if it wants to reconsider an issue, and I'm not sure that FERC has done that in this case. No, certainly it hasn't with respect to this, but I think what I'm trying to say, I think there are, you know, proceedings go on. Once issues are brought before the court, there's often agency proceedings, and I think the commission and the case law sort of draws a line between things that are before the court that are being reconsidered. That's barred, but to the extent there's distinct issues that are before the agency, they can continue to act on those. But, yes, there was no motion for... to ask for it back in this case. Does FERC's May 2nd order render the capital structure issue moot? Certainly there's rightness concerns. I mean, I think, you know, I think it's sort of definitively ruled that Exelon's capital structure will not be used, which is the result of the orders before the court. You know, the proposal was to use ExGen's, or whatever its new name is now, and the commission's ruling was that we have questions about that. That hasn't been shown to be just and reasonable, so it's set the matter for hearing. Now, certainly it's a possibility the commission could say, for the reasons we said before, ExGen is not a good, it's anomalous. It could ultimately come back with a capital structure that's different or maybe similar to Exelon's, not exactly Exelon's. But I think the point is it's uncertain at this point how the commission will rule. But do you understand the commission to have irrevocably foreclosed using ExGen rates? I don't take this order to say that. I think it's sort of like what happened in the start of this case, where ExGen was proposed initially. The issue wasn't found to have been just and reasonable on its face, so the matter was set for hearing. So if we get past your sectional question, then is it still possible that the ultimate result that MISTIC wants is in fact the result that will come about? Yes, that's my understanding of the May 2nd order, that it's setting the entire matter for hearing, and certainly Troy MISTIC will argue that ExGen is appropriate. And you think that argument is open to them? I do, I do. But again, obviously the possibility of the commission to say that no factors have changed with respect to the anomalousness of ExGen. But that's my understanding of the order, setting the entire thing for hearing, and the parties can make their arguments as to whatever they think the order is. Would the commission need to identify some alternate rate that exists? Could it just pick a rate, a ratio? I'm sorry, I keep using rate, but I think ultimately we have a ratio here. In some circumstances it does just create a hypothetical capital structure, usually with new entrants into the market where they don't have a parent to draw from. Because the point is the model capital structure that was seized upon now can't be the one. Correct. So it's got to be something else. Yes. And the default would be that it would be the immediate parent. Yes, provided that would provide just and reasonable results. And in the orders before the court now, the commission ultimately determined that. So even then on what's going to be reconsidered, it would still be that the default would be the immediate parent. It's still the case that the commission could determine that that's anomalous and therefore won't be applied. And then there will be a search for some alternate. It can't be the model that's already been used, so it could be one that is just calculated and applied, or it could be a different model. Correct. That's my understanding of the scenario, right? Yes. The baseline rule is your parent unless it provides just and unreasonable results. If that is the case, then there's a search for a suitable substitute. And I think this order – what this order does clearly say is that Exelon can't be used. Whether a hypothetical account structure with a similar ratio is used is certainly possible. It does seem the commission should consider maybe a motion for voluntary remand in this case, so we don't set a precedent for deciding issues by the commission in circumstances where a case is already within our jurisdiction. I understand, Your Honor. Thank you. With respect to the – unless the court has questions about the substance of the capital structure ruling here. With respect to the Everett acquisition costs, I think the timeline is important here. March 23, 2018, Exelon submits – I'm sorry, when its current capacity obligations expire in May 2022. A week later, they announce that – so after they announce the retirement, they're going to acquire Everett. So there was no – and I think it's undisputed – there was no expectation that they would recover the acquisition costs through sales to MISTIC after May 2002. So then the MISTIC agreement comes out of the blue. We have captive rate payers and the commission applied causation principles to it and determined that certainly the captive customers are not the cause of this purchase. And the reply in the reply brief is that, well, they benefit from it. Certainly they do benefit from the fuel purchases from MISTIC. That's why they're being allocated 91 percent of Everett's costs, and they are being obligated to – or the capital improvements made to provide service during the term of the agreement are allowed to be flowed through. But as to the acquisition itself, there's no benefit to the rate payers, whether the name at the top of the corporate structure for Everett is NG, as it was previous – right before the retirement announcement, or it's Exelon. So that's really the core of the commission's determination with respect to that issue. Unless there are any further questions. Let me make sure we don't have further questions. Thank you, counsel. Now I think if I've got the order right, we'll hear from Mr. Coyle, interviewer in support of the commission. And since we don't have a timer up there for you, you have four minutes, as you know. The whole four minutes, Your Honor, I'll speak as quickly as I can. All these Irishmen, Fitzgeralds, Kennedys, and Coyles. Anyway. Let me try and make this brief, Your Honor. My clients were the people who actually litigated the rate base issue before the commission. Mystic argues in its main pages 18 to 34 that it paid $925 million for Mystic 8 to 9. That is a characterization. It's more informative to say that Exelon attributed a value of $925 million to its acquisition, and that attribution reflects a number of upward adjustments in at least three successive asset valuations between 2011 and 2013 that are attributable to expected future market earnings, acquisition premium, and the anticipated tax benefits of accelerated depreciation. For record context, I would invite the Court's attention in particular to the joint appendix under the sealed volume of the appendix, pages 2096 through 2111, which is my redirect of our witness, Laura Steffen, which steps through those various adjustments. Why is that important? Well, it's important because there's another principle at issue here in addition to the rationale for the original cost rule, which, by the way, the application is not unprecedented. FERC applied the original cost rule to the transition of a merchant unit to cost of service status in the Pacific Corp case in 2008, 124 FERC paragraph 61046, paragraph 28. But the real rationale here goes back, and I invite the Court's attention to Judge Silberman's decision in the Northern Border Pipeline, 129 Fed 3rd, 1315, where Judge Silberman says, you know, the concept of original cost accounting is a bedrock principle of FERC's uniform system of accounts. Why do we do it? Well, one reason why we do it is the one that the Court has explored in colloquies with other counsel, and I'm not going to revisit that rationale for you, but there's another one at play, which is the Supreme Court's holding in Hope Natural Gas, which says that whatever you're going to base fair value on, you cannot base fair value for rate-making purposes on projected earnings, on what the facility would be expected to earn under the rates that are being set in this proceeding. And that is 320 U.S. at page 601. The Court said, the heart of the matter is that rates cannot be made to depend on fair value when the value of the going enterprise depends on earnings under whatever rates may be anticipated. That is the fundamental problem that you have here, ascribing the utmost of good faith to all the participants in all the various purchase and sale transactions. Those valuations are based on capitalized projections of future earnings. The Supreme Court has held that that is not an appropriate basis for setting cost of service rates. If you go back to the case that Judge Silverman relied on in Northern Border Pipeline, excuse me, the United Gas Pipeline decision, 25 Federal Power Commission, we're going way back here, 1961, 25 FPC 35 at pages 64 to 65, the commission there adopted the same rationale that they applied under July 17th rehearing order in this case. If I could just finish this point. That is to say, investors can pay whatever they want for a utility facility, a generator. And that's on them. They can use whatever considerations they want to set a price. That's United Gas Pipeline. It's paragraph 110 of the commission's rehearing order from July 17th, 2020 in this case. But those projections turned out not to be correct. If they had turned out to be correct, we wouldn't be dealing with a question of cost of service rate. Therefore, they're not a reliable basis for setting the cost of service rate. And that is, as I say, a position that extends all the way back to the Supreme Court's decision in Hope Natural Gas in 1943. None of this is new law. Okay. Thank you. Thank you, Mr. Coyle. Mr. Fitzgerald, you asked for three minutes. We'll give you your three minutes for rebuttal. Thank you, Your Honor. So, there's really one point on rate base that cuts through a lot of what has been said about who should bear the supposed risk of us paying $925 million and the idea of uniformity and the right test. And that is to keep in mind that the $925 million is below the original depreciation line if you set aside the transactions. Transactions which had nothing to do with cost of service, no incentive to inflate or be lower or to have any relation to cost of service whatsoever. So, it isn't that we paid some exorbitant price, it turned out poorly, and now here we are to claim the exorbitant price. It's below the original depreciation line. The real problem is taking into account these prior transactions that had nothing to do with cost of service and the distressed asset, $550 million. Now, to keep in mind, what FERC has said is that the transfer-in-lieu foreclosure, the value of the debt forgiven is the $550 million valuation. And so, even that on its face is not necessarily a syndical way to value something. I mean, if a bank forecloses on a house for the value of the debt, the house may be worth more than that. I mean, their theory is premised on the idea that this facility was built for a billion dollars and one year later it was worth barely $550 million. And our point is, and they're saying, they're trying to attribute that whole thing like in a cost-of-service world, but our point is in a cost-of-service world, something like that doesn't happen. Cost-of-service utilities are able to get their cost of construction. So, construction delays, market variations up and down don't tend to bankrupt projects like that. In fact, cost-of-service generators and utilities can get their cost of construction ahead of time if they ask for it. So, it's really this long history that has nothing to do with cost of service. We ultimately paid on merchant market this $925 million, attributed to it by an independent accounting firm as part of a larger transaction, at a time when there was no reason to inflate, no incentive for that to be any bigger than the actual value. And that's the proper value that should be used in rate base. On the fuel supply, just briefly, I know there's another argument coming and connected in this case that's going to have a lot more to say about Everitt. But I would just say, this is not FERC regulating Everitt in its own right. What FERC is doing is regulating MISTIC's fuel supply. Any cost-of-service utility is going to have these elements. One of them is fuel supply. May I finish? You can stop, yes. One of them is fuel supply. And in evaluating fuel supply, it's proper to include all of the normal aspects of that, including who bought the facility. Thank you, Your Honor. Thank you, Mr. Fitzgerald. We'll now shift to Part 2 of the argument, the state petitioner's issues, and we'll hear from Mr. Schwartz when everybody's settled. So we see the timer on the screen. Is it going to be at the podium, too, or is that? No, but we've got it. They've got it. Good. All right. Thank you. Thank you. Good morning, Mr. Schwartz. And you'll see the timer on the screen instead of at the podium. Thank you, Your Honor. May it please the Court, I'm Jeffrey Schwartz of the state petitioners, and I'd like to reserve five minutes for rebuttal. As you've heard, MISNIC buys fuel from what is now an unregulated corporate affiliate, the Everett Gas Terminal. We're here today because FERC allowed MISNIC to recover from its captive electric rate payers an extra $75 million to subsidize Everett and its sales of fuel to third parties. FERC assigned MISNIC and its rate payers 91% of Everett's costs when MISNIC is physically incapable of using more than about 35% of Everett's capacity. And at the same time, FERC allocated no cost to an entire category of other use. Everett's sales of vapor regasified LNG to third parties. FERC then compounded its error by relieving MISNIC of the obligation to credit the revenues from those sales. And to refund certain charges if Everett stays in business selling gas to other customers when the MISNIC agreement ends. FERC's decisions were contrary to its precedent and were not supported by substantial evidence or reasoned decision-making. In fact, when it came to Everett, FERC consistently said one thing and did another. Let's begin with cost allocation. FERC said that MISNIC's customers should pay only for the Everett costs attributable to serving MISNIC, but that promise was empty. The evidence was undisputed that Everett was not planned to serve MISNIC. It was built 30 years earlier. Everett is not reserved for MISNIC's use. Only a tiny portion of the Everett facilities serve MISNIC exclusively. There is the pipes connecting the fuel facility to the generators. And the rest of Everett's facilities are either common facilities that serve all customers, like the storage tanks, facilities that serve MISNIC and some other customers, like the high-pressure vaporization systems, or systems that serve only other customers, like the low-pressure vapor systems, the pipeline interconnection, and the liquid delivery systems. And FERC did not tally up and exclude the costs of the facilities that MISNIC can't use. Instead, it treated all Everett costs as common costs and allocated them based on the ratio of historic liquid sales and historic vapor sales. It didn't allocate the liquid part, right? It at least discounted the 9% that is liquid. That's true. So the 9% is the volume of gas that was sent out in liquid form as compared to the total amount of gas sent out. So FERC applied that ratio, the 99.9%, split to all of Everett's costs. And held MISNIC and its captive electric rate payers responsible for the entire remaining 91%. And FERC failed to answer two objections to that allocation. First, the record showed that MISNIC would use much less gas during the contract term than it had burned historically. So the historic 91%, 9% split was unlikely to be a good predictor of the usage of the Everett facility during the contract term. And FERC never responded to that point at all. Second, FERC allocated no cost to third-party vapor sales. And that was despite FERC's own acknowledgment that New England rate payers, and this is a quote from J1323, New England rate payers and third-party customers should share Everett's costs as a matter of fairness and cost causation. So on rehearing, FERC tried to rationalize that decision. It said that actually it's okay to assign all of the vapor functionalized costs to MISNIC because MISNIC benefits from the third-party sales. According to FERC, MISNIC benefits from those sales because the sales help Everett manage the inventory in its tank. But that argument was contradicted by FERC's own findings elsewhere that some third-party sales complicate tank management and impose additional tank management costs, some of which MISNIC rate payers will bear. So the benefit assertion is unfounded. But more fundamentally, FERC gave no reason to treat MISNIC as the only beneficiary of Everett's tank management. The tanks hold all of the gas for any of Everett's sales, whether it's liquid or vapor, whether it's MISNIC or third parties. So all customers benefit from the tank management. Including MISNIC. Including MISNIC. But that doesn't, you know, when the benefits are diffused, this course precedent holds that it's not just unreasonable and it's already incapricious to target all of the costs to just one of the many beneficiaries. And contrary to this course precedent, FERC made no effort to ensure that the tank management benefits supposedly accruing to MISNIC were roughly commensurate with the fixed cost burdens being shifted to it. The court doesn't have any questions further about the cost allocation. I actually do have a question. I was wondering if you could respond to some of the arguments made by ISO New England and its intervener brief about this issue. I'm not sure if I entirely understand this, but they say that, you know, FERC was very concerned with maintaining an incentive for Everett to continue in business. And that's why they allocated 100% of the vaporized costs to MISNIC. So I believe that the incentive, the ISO was concerned, of course, that Everett continue in business as it's the sole fuel supply for MISNIC. But I think the incentive issue goes to a different point. As you know, Everett sells gas not only to MISNIC, but to two interstate pipelines, to a local distribution company. And those sales to third parties provide fuel security benefits that help the entire region. They provide fuel security benefits both in terms of providing non-pipeline gas, for lack of a better term, to electric generators throughout New England. But they also provide gas for use in heating, which will reduce congestion on the pipelines. And third, injections into the pipeline at MISNIC and Everett, which is kind of the terminus of the general flow into New England, supports the pipeline pressures and supports the operation of the pipeline and improves the pipeline's ability to deliver gas throughout the region. So there are all of these benefits that accrue, none of which are captured just by looking at the gas that MISNIC buys from the facility. Now, I'd like to make one further point about that, Your Honor. The evidence in this case is clear that MISNIC relies on Everett. But there is very sparse evidence, if any, in the record about the extent, if any, to which Everett relies on MISNIC. There was some testimony that if MISNIC retired, that is, if MISNIC made zero contribution to Everett's costs, that could jeopardize Everett, not that it would, but it could. But there is no evidence in the case at all that a 39% contribution by MISNIC to Everett's fixed costs would be insufficient to keep Everett in business, let alone any evidence that a 91% contribution is required to keep Everett in business. That just isn't in the record anywhere. And FERC was certainly purported to make no such findings. FERC's sole justification for the cost allocation was the historic ratio of vapor sales and liquid sales, ignoring that an entire category of vapor sales are made to other customers. Thank you. And why, in terms of Everett staying in business, what's the relevance of that to this proceeding, other than insofar as Everett needs to stay in business in order to make sure that MISNIC is able to fulfill the interest that the Commission has in MISNIC vis-à-vis the rate payers? I agree with you, Your Honor. The right way to look at this is, you know, what percentage of Everett's capacity is MISNIC capable of using? And, you know, the state petitioners use that percentage, which is MISNIC's maximum possible use of Everett's capacity. So that's an unrealistically high percentage to begin with. We use that percentage as representing a fair contribution from MISNIC and its captive rate payers to Everett. And bear in mind the context for this, Your Honor. Everett is not a regulated cost-of-service facility. Congress deregulated first sales of natural gas, wanting those sales to be governed by the market. So the question in this case is, how far can FERC push its Federal Power Act authority by virtue of MISNIC's involvement here to remove Everett costs from the market and shield Everett from market risk? Let's move on and say a couple of words about revenue crediting. Okay. The two important points to understand about revenue crediting is one, that FERC didn't justify taking the revenue credits away, but second and more important, that restoring them would not fix FERC's awareness. The underlying and fatal error is the cost application, which created problems that the credits can't solve. In a market, sellers need to make sales to cover their fixed costs. And, of course, they keep all their revenue, and that creates strong incentives to sell. But FERC's cost allocation here obliterated that incentive to sell vapor to third parties. Does it work in the opposite direction, though? I mean, your point, I take it, is that adding revenue crediting won't fix the problem with cost allocation, but if you fix the problem with cost allocation, then you don't need revenue crediting. That's correct, Your Honor. Okay. That's absolutely right. And, in fact, that's what we told FERC. We told FERC the best way to incentivize Everett to make sales is to allocate an appropriate percentage of Everett's cost to Mystic, 39%, in which case Everett would need to make sales to third parties in order to cover its remaining costs, and it would keep all of that revenue. Finally, let me turn to the clawback issue. FERC failed to justify carving out Everett's costs from the clawback that the agency required. FERC said that it lacks jurisdiction to clawback Mystic's charges for Everett's costs, but jurisdiction is not a one-way street. If FERC can let Mystic pass through Everett's costs, it can require refunds of unjust and unreasonable amounts. And, in this case, well, actually, in this case and in all reliability must run agreements, FERC says, in general, when capital is invested, the normal rate-making approach is you amortize that investment over the length of the facility. In these reliability agreements, because of the prospect that the facility will retire, FERC allows an exception to accelerate the recovery of those capital expenditures entirely within the two-year term of the agreement. But that's just and reasonable only if there is an attendant commitment to refund the undepreciated portion of those costs if the facility does not retire, if it continues, if it returns to merchant operations when the cost of service agreement ends. And that is necessary as a matter of fairness to the rate payers, because they should not be subsidizing post-agreement merchant operations. That concept applies whether or not the charges that Mystic collects are for improvements to Mystic generators or whether they are for improvements to the Everett fuel facility. In neither case should Mystic's rate payers during the two-year agreement be responsible for paying all of their allocated costs for facilities that will remain in service on a merchant basis selling gas to other customers for the next 25 years. I'd like to reserve remaining time, please. Thank you, Mr. Schwartz. We'll give you that rebuttal time. We'll hear from Commission Counsel now, Ms. Banta. Good morning. Carol Banta for the Commission. And I would like to start with a brief explanation of Mystic's relationship to its fuel supplier. And I want to point specifically to a couple of places in the record. And these are cited in the order and are briefed in a way that I'll explain, but first I want to go to the description. At JA, this is in Volume 3, JA 1021 and 22, really through 24, as well as 1033 and 1034. And this is a Mystic witness explaining that the Everett terminal, the way its operation doesn't simply supply Mystic. It revolves around Mystic's needs and the way it has to juggle that with the amount of gas it can have in its storage tanks and these natural gas ships that have to be scheduled well in advance that have a capacity that nearly fills the storage tank so that it's a back and forth juggling of making sure there's enough gas in the tanks for Mystic, and that's especially true under this fuel security agreement, while also making sure that the tanks are empty enough when a ship arrives to take that shipment. And so there's this description here about what this witness called a tricky balancing act and the integrated operation and the point being here that the way Mystic, the way Everett operates its terminal, including the way it makes third-party sales, revolves around making sure it's there to serve Mystic's needs, both by being able to have the tanks empty enough to get gas when the gas arrives on the ship, but to have the tanks full enough, when Mystic needs to draw on it to supply power, and again, especially during the fuel security agreement. Now, the commission cited the Mystic brief that had summarized this exact testimony, actually uses the same language as the tricky balancing act, in... Let me get that site for you. The leaf site is also in our brief, which was part of the order that had discussed that with respect to tank management costs, but the commission cited to the pages in Mystic's brief that discussed this testimony specifically, with regard to the allocation of costs, and that is in volume four, at days 15, 80, and 81, when the commission said that it is reasonable to allocate the fixed Everett costs as part of the fuel supply charge that Mystic is incurring, and it says, liquid gas is exclusively used to serve third parties, and I can talk about the evidence for that as well. Everett sales of vapor gas primarily benefit Mystic, and the commission says, yes, vapor sales are made to third parties, but those third party sales benefit Mystic by helping to manage Everett's tank, and then footnote 148 cites Mystic's brief that discusses exactly the testimony I was just describing. So, when the commission says that even sales to third parties benefit Mystic, it does support that with the record, and it is supporting the record. But doesn't everybody get the benefit? That's what I don't understand, is why is it being treated as if Mystic is the only beneficiary, and therefore it's fair? Because Mystic is the primary beneficiary, because it is managing its operation around Mystic's needs. With these incidental other sales to third parties, but the operation is integrated with how Mystic needs it, and making sure that the tank is, that the gas is there when Mystic needs it, and that the next ship that comes in can be loaded into those tanks because Mystic needs it. And another... Does that explain, though, why 100% of those costs go to Mystic? I mean, even if Mystic is, if Everett is revolving its business around Mystic, and Mystic is, you said, the primary beneficiary, it's still not the only beneficiary. It is... It is the primary, yes. It is maybe not exclusively a beneficiary, except that those sales are made also for its benefit. But I would also point to another part of the record. The commission, in choosing among the different proposals that different parties have made, chose the trial staff's proposal, which did the 91 and the 9. And trial staff, as they described in their brief, which I think we did cite, and that was cited in the order as well, looked at historical usage data, not just the capacity of what's there at the Everett terminal that could, in theory, be used, but how is it actually being used. And that's where I would point also to Staff Exhibit 0006. And this is at Volume 2, JA648 and 649. This is what Ms. McComb's testimony for staff, which is what the staff brief is based on. And her testimony is around 956 and 957 in that same volume. But if you look at the chart on JA648, and this is why Ms. McComb said in her proposal that we can exclude the average of 9% that's going to liquid. That's coming from the chart on the left side of JA648. And this is historical send-out from the Everett terminal from 2003 to 2017. Now, in the center, we see deliveries in vapor form. That's vapor sales, whether to Mystic or anyone else. And you can see the sharp decline in the numbers after 2012. So, I mean, Everett is not operating at the same send-out with its capacity that it was in, say, 2006. That's just one thing we can notice from this chart. But she was looking at the numbers, except for a brief spike in the mid-2010s, the liquid that has gone out has averaged 9%. And she also has testimony in Ms. McComb's testimony and in the trial brief that the commission relied on in adopting their proposal, that liquid deliveries are not used to manage the tank. That's why the commission agreed to... But that's not what we're concerned with. We're concerned about the 91% and why all of that is being allocated to Mystic, right? Right. Well, because we back out the liquid, which doesn't play any role in the integrated operation that I started with, that Mystic's witness had described. Right, but nobody is worried about that, I think. Right, and so the commission said, when we look at the way Mystic operates and the historical usage data of who's using it now, that Mystic is the primary customer and the primary beneficiary, and when it sells to others, it's doing so to empty the tank to the level it needs to get another shipment. Well, when you say primary, I mean, primary could mean that Mystic takes, you know, you know, nothing close to approaching 100%, but just more than any other entity, right? I mean, what does primary mean? The system operator put in testimony, but I don't know what the commission cited, so the system operator put in testimony that it's two-thirds. So it's at or above two-thirds because we're averaging about the 56 million, going back to that chart where it used to be 173 million. I think it's a million BTUs. I might be wrong about the unit. But it's down to 56 million at that point in the years leading up to this agreement. Mystic is the primary customer, and under this agreement, it especially is the primary customer because it has to have the gas be there because that's the whole reason for the geosecurity agreement and the penalties that Mystic would incur. Even if it's two-thirds, and I don't recall much of this being discussed in the commission orders that we're reviewing as opposed to the explanation that you're elaborating on now, but even if it's two-thirds, if we're just doing rough math and we use the two-thirds figure, that's not 100. And so it still seems like there's got to be some explanation for why of the 91% that's vapor, once you discount the 9% that's liquid, why the 91% is being entirely allocated and ultimately paid for by Mystic's ratepayers. And I don't see that in the commission's order. Well, and that's where I come back to the it's the 2nd July Reviewing Order, J1580 and J1681. It's based on everything else that I've explained. The commission citing Mystic in particular with the description of how the Everett terminal operates for Mystic's benefit made the finding that Mystic is the primary beneficiary and that the third-party sales benefit Mystic, and it cites the Illinois Commerce Commission roughly commensurate standards. And this court has some similar cases where even when it's not 100%, the primary, that it can be allocated... Doesn't FERC have to do something more to kind of match up costs and benefits? I mean, all it says here is these benefits are not trivial. Okay. Maybe it's more than two-thirds, but less than 100%. Well, this court has never required the exact same precision. No, of course. But this seems very rough. Well, it does cite to the Mystic... Again, the Mystic witness explained in much more detail than I have here why it is that even the facilities that don't send gas to Mystic but send it to third parties are used for the benefit of Mystic's operation. And again, the trial staff, as they explained their proposal that the commission adopted, it was the only one that was based on historic usage data rather than the percentage of particular facilities, that it was based on how this was actually being used. Do the sales to Mystic benefit the third parties in the same way that the sales to third parties benefit Mystic? I don't know that we have any evidence. I mean, certainly... Why wouldn't they? Electricity rate payers. But given that the sales to third parties are made to manage the tank as Mystic needs it, I don't know that they have any benefit that they wouldn't... Well, it just seems like the tank management... I mean, part of the problem is I don't see an explanation otherwise. So maybe there is an explanation otherwise. But just as a matter of rough understanding, it seems like the tank management... Yeah, it definitely benefits Mystic. But it seems like the benefit would run in the other direction, too. And then at that point, just because it does benefit Mystic, is it appropriate to allocate the entire cost to Mystic's rate payers when, at least as I would conceptualize it, the third parties are benefiting also when Mystic gets the tank management benefits. And I think there are cases from this court as well as the 7th Circuit that don't demand a one-for-one and that the majority might be enough for the 100. And we submit that, in this case, that it is because of the way it is managed for Mystic. I do want to add, although it's not really an issue here, just so it's clear, when we talk about the revenue crediting and the third-party sales, we're only talking about forward sales, which are beyond three months, to the extent that Everett makes spot sales or shorter-term sales for purposes of emptying the tank or whatever. There was no dispute in any of this, and the Commission did clarify in the final order that those revenues are credited 100% back to Mystic. Those are not retained by Everett. So there is revenue from sales to third parties coming back to Mystic, just not the particular forward sales that initially there had been an effort to put in an incentive, and that's what the Commission decided not to do. So it's not that no other parties are paying any money back to Mystic for this, just as a matter of making sure the record is clear on that. But that was not an issue. There was no argument. No one was disputing those sales here. But that is what the Commission based the 91% on, was the primary benefit. But I wanted to make sure that we may not have explained fully previously this symbiotic relationship between the two, which, like I said, the Commission did cite it. We just didn't flesh it out as much as we could have previously. But that is what the Commission was looking at. And again, taking also together with the fact that, as Mr. Kennedy discussed, Mystic didn't get all the costs of effort that it wanted here. It didn't get to collect on the acquisition costs. So this part is about the fixed operating costs. And so the Commission did go with the 91% because with the proposals before it, the trial staff was the one that backed out the one category of sales that we can categorically say does not benefit Mystic or Mystic's rate payers, and that's the liquid sales. And so based on the historic uses data, the Commission chose that. It didn't have to be the only reasonable way of doing it, but the Commission thought it was the best one. And as long as it's within a zone of reasonableness, the Commission wasn't arbitrary in choosing that. I also want to pick up on a point from earlier about whether Everett stays in business. The Commission didn't focus on any of this on whether Everett stays in business beyond the end of the RMR agreement. That's not what any of this was about because Everett is not jurisdictional. The Commission doesn't have a stake in that because, as it's found with the revenue crediting and the fallback, Everett is not in the Commission's jurisdiction. Its role in this case is solely as the fuel supplier with the fuel supply charge that Mystic is collecting under the fuel security agreement. And so when the Commission found in some aspects like the fallback that it might be intruding on Everett's operation by finding an incentive for Everett or in some way regulating or directing its focus at what Everett might do, that was beyond the Commission's jurisdiction and that was the Commission's reason for pulling back. It seems like there's a disconnect between saying on one hand that Mystic's costs that are attributable to Everett can be taken into account, notwithstanding the Commission's lack of jurisdiction over Everett for purposes of fuel supply costs. But then the jurisdictional problem prevents that same kind of dynamic from operating with respect to the fallback. I understand that it seems like they stand or fall together because in both situations, it's not that the Commission's doing something directly with respect to Everett. It's that the Commission's doing something with respect to Mystic that takes into account the consequences of Everett for Mystic. Except with the fallback, it would be concerning Everett because the Commission does have a stake in whether Mystic retires at the end of this agreement or not and requires a fallback because you don't get to go into this kind of agreement and collect your capital expenditures and things like that under this kind of agreement that's premised on its retirement and then decide to go back into the regulated market with the advantage of keeping those things. Any of the costs that are flowing to Everett are only costs that it's paying its fuel supplier, which, as the Commission pointed out, if they were connected to a pipeline and they could buy from any fuel supplier on the market, they would be paying these kinds of costs, but they wouldn't be broken out in a cost-of-service analysis. It would be a black-box charge from a third-party supplier. The only reason the Commission got so into the weeds on Everett's costs here is because of, well, the fact that it's the only fuel supplier, it's the only thing Mystic's hooked up to, and it's an affiliate, and the Commission said that requires extra scrutiny. So it did cause some confusion when the Commission is analyzing cost-of-service for an entity that it doesn't regulate, but it's only doing that to determine whether the fuel supply charge is reasonable. But it's not... So any of those kinds of costs would be built into what any fuel supplier would be charging Mystic if there could be another fuel supplier. It wouldn't have been examined in this way because it would just be some third party. And at the end of the Mystic agreement, if Mystic doesn't retire, it has a clawback for things it's gotten, like capital expenditures. But it doesn't get to get back the fuel cost it paid to whatever fuel supplier it had at the time. I think that's how the Commission looked at it. We're not going after the fuel supplier whether it was X company or, in this case, Everett, because they were just recovering their costs of providing the service for that two-year period that they were the fuel supplier. And that's how the Commission looked at it with Everett's jurisdiction... or Everett's business  not being in the Commission's jurisdiction. If there are no further questions... Okay. Thank you. Thank you, Ms. Mantis. I think we have the rebuttal time for Mr. Schwartz. It's about six minutes. Thank you, Your Honor. You asked the question of whether sales to Mystic benefit third parties. The answer is they do, or they can't. If Everett has engaged in a forward sale to third parties three months forward, they need to make sure that they have fuel in the tank for that. If they need to receive a new shipment of gas and they need to make room in the tank for that, one of the mechanisms available to it is for Mystic to self-schedule the generation. That is to take the gas, burn it, run the generation regardless of the electricity market price in order to make room in the tank. So at least some sales to Mystic do benefit third parties. Counsel for the Commission referred to evidence in the record submitted by a system operator witness about the historic percentages of gas sent out to Mystic versus third parties. I'd like to just contextualize that a little bit. The 67% is associated with a five-year window from 2012 to 2017. Prior to that, before 2012, Mystic's percentage of the gas was 40%. So it varies pretty significantly with time. And of course, the 67% window ends in 2017. So what has happened since then, from 2018 when Exelon acquired Everett until 2022 when this contract starts, Everett is in the market entirely. There's no cost of service recovery through Mystic. So Everett is out there trying to make whatever sales it possibly can make. I guess another point about the 40%, 67% numbers. There's evidence in the record I alluded to earlier. And I'd like to direct the court's attention. I have to be a little careful because the specifics are protected. And unfortunately, we didn't include this in the sealed portion of the joint appendix. But I'd like to direct the court's attention to Mystic's initial post-hearing brief to the commission. It's a privileged document. It's record number 279. And the relevant passage is at page 117. And in that brief, Mystic tells the commission how it expects Mystic's gas use to change going forward once it has acquired the facility compared to the prior use when it's unaffiliated. Long story short, Mystic plans to use a lot less gas going forward than it used historically. And part of the reason why it used so much gas historically was that the prior fuel arrangements with the prior supplier included a must-take requirement and provided Mystic a discount off the market price. So when we look at the percentage of the volumes of gas sent to Mystic versus third parties, the percentage that third parties actually took from Mystic understates their contribution to the revenue because they're presumably paying the higher market price compared to Mystic's discounted price. In addition, there's evidence in the record that many of the third party sales are option contracts. So there's option value to the third parties. They can call on gas from Everett when they need it. But they don't need to, and usually option contracts provide a payment for the option value independent of the payment for the gas when it's taken. So there's an additional revenue source from third parties. There's an additional benefit that third parties derived from Everett that's not captured in the data about how much gas is going to Mystic versus going to third parties. And of course, the commission itself relied on none of this in its order. The commission itself just looked at 91%, 9%, and didn't really trouble itself with the details. One other point about that, Your Honor, Mystic and Everett, the affiliate company, may well have looked at this as being all about Mystic. But that is, in some ways, a self-fulfilling prophecy. If you look at it that way and allocate all the costs to Mystic, then Everett has no need to make sales and no incentive to make sales to third parties. That's not what Congress envisioned when it took facilities like Everett out of the market and deregulated them. Finally, a note about the clawback. The issue with respect to the clawback is whether it is just and reasonable for Mystic's rate payers in the two years of the agreement to pay 91% or some small percent of improvements made to Everett, even if Everett goes on selling in the market for 20 years to other people after the Mystic agreement ends. That's not just unreasonable, Your Honor. Make sure my colleagues don't have questions for you. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Rao